Filed 1/21/15  P. v. Gomez CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.111.5.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>　Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO GOMEZ,<br><br>　Defendant and Appellant. | 2d Crim. No. B251602<br>(Super. Ct. No. BA319474-01)<br>(Los Angeles County) |

　　　　　Antonio Gomez, a middle school teacher, appeals from the judgment entered after a jury convicted him of six counts of lewd conduct on a child under the age of 14 years (counts 1-6; Pen. Code, § 288, subd. (a))[1] and six counts of lewd act on a child 14 to 15 years of age (counts 7-12; § 288, subd. (c)(1)).  On counts 2 through 6, the jury found that appellant had substantial conduct with the victim within the meaning of section 1203.066, subdivision (a)(8).  The trial court denied probation and sentenced appellant to 17 years 4 months state prison.  We affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

*Statement of Facts*

Appellant, a physical education teacher at Robert Luis Stevenson Middle School (Stevenson), victimized two female students in 2005 and 2006. The modus operandi was the same. Appellant befriended the victims, promised to look out for them, and changed the relationship from teacher-student to teacher-lover.

*Counts 1-8; E. O.*

E. O., born May 1992, attended Stevenson from sixth to eighth grade. Appellant was her physical education teacher. In February 2006, appellant took E. to a room next to the gym weight room, told her to bend over, and touched her butt and thighs on top of her clothing. After he finished, he told E. to leave so no one would see them together.

A few days later, appellant called E. to the weight room and had her grab his erect penis on top of his clothing.

In March 2006, appellant summoned E. to the P.E. office and told her to "give him head." Appellant ejaculated into his hand, asked if she liked it, and said it was "normal for people to do." Appellant had E. orally copulate him on other occasions.

On May 12, 2006, appellant took E. to a motel and had intercourse with her. Appellant drove E. home and dropped her off two blocks from her house.

A few weeks before graduation, appellant pulled E. out of class and had sexual intercourse with her in the faculty restroom.

After E. graduated, appellant said that he would help her buy a computer if she helped him with grading. Appellant had E.'s mom sign a consent slip and told the school principal that E. was his goddaughter. E. visited appellant several times without checking in at the school front office. On one occasion, the school security guard caught them together and ordered E. to leave.

In April 2006, appellant began calling E. late at night, sometimes drunk. Appellant said that he loved her, that he wanted to be with her, and that she should learn about sex from him.

E. grew tired of the calls and "didn't want to do it anymore." She told her mother and friend/classmate, Karina N., about appellant. When appellant flirted with two other students, G. G. and Griselda G., E. told them that she had sex with appellant.

On February 17, 2007, E. reported the sexual abuse to the police. While at the police station, E. phoned appellant and said she had agreed to take a sexual assault exam. Appellant tried to dissuade her and said "it's against the law for them to . . . do the examination."

On February 26, 2007, Dr. Lynne Ticson, a pediatrician, performed the sexual assault exam. E. reported acts of oral copulation and vaginal intercourse and tears on her hymen consistent with vaginal penile penetration. On February 28, 2007, E. told police detectives about four incidents of oral copulation and two incidents of sexual intercourse.

After the police report was filed, appellant's parents, Malaquias Gomez and Norma Gomez , met with E. and E.'s mom (Maria O.) and offered to pay for E.'s college education if E. "dropped" the charges. Appellant's former attorney, Seymour Amster, interviewed appellant's parents about the meetings with E.'s mother and E. Amster also met with Maria and spoke to E. on the telephone.

Appellant retained new counsel and defended on the theory that E.'s accusations were false. Appellant's parents testified that they met with E. and Maria at an IHOP restaurant and that E. admitted "it was all a lie." Malaquias Gomez said there were eight meetings with E.'s mother, that Amster knew about the meetings, and that he and his wife were arrested for offering money to E.

In rebuttal, the prosecution called Attorney Amster and asked whether Maria told him that E. was lying about the accusations. Amster responded that Maria "never said that to me." Amster spoke to E. on the phone and denied that E. ever said that she was lying.

3

*Counts 9 -12; G. G.*

G. G., born April 1991, attended Stevenson with her older sister Griselda G. When G. was in the sixth grade, Griselda introduced her to appellant. Appellant asked if she was a virgin and told her not to have a boyfriend. On three occasions, appellant "pulled" G. out of a math class to help grade papers. School security guards warned G. to stay away from appellant and that he was married.

In May 2005, appellant kissed G. and touched her breasts on top of her clothing. A few days later, appellant kissed her and put his tongue in her mouth.

In June, G. went to Knott's Berry Farm on a school graduation trip. Appellant asked her to go on the amusement rides. During the log ride, appellant kissed G. on the neck and touched her breasts. On the bus ride back home, appellant kissed G..

*Uncharged Acts*

When Griselda G., G.'s sister, was in the sixth grade, appellant asked Griselda if she was a virgin and told her to "stay pure." Appellant "pulled" Griselda out of class several times to help do "locker work."

Griselda believed appellant would marry her when she turned 18. In high school, appellant asked her to write a love letter and show him how much she loved him. Appellant visited frequently and, during one visit, drove Griselda to a park and tried to kiss her.

Appellant also sexually abused Mary F., E.'s friend and classmate at Stevenson Middle school. Appellant told Mary to lose her virginity to "someone that's important" such as himself. Appellant called Mary several times and said, "Tell me you love me." On one occasion, appellant touched her vagina over her clothing. On another occasion, he kissed her on the cheek.

Karina N. testified that appellant touched her on the buttocks at school. Karina was shocked, tried to avoid appellant, and stopped talking to him. After E.'s mother confronted appellant about E.'s sexual abuse, appellant called Karina and left voicemails. Appellant kept calling. Karina decided to answer one of the calls and used the "record" option on her cell phone to record the call. During the call, appellant

4

admitted that he had feelings for E. After Karina told E. about the call, the police made a copy of the phone recording.

*Recorded Phone Call*

Appellant argues that the trial court erred in admitting the phone recording pursuant to section 633.5. Although the phone call was surreptitiously recorded, the trial court found that it was a communication relating to a felony involving violence against a person with the meaning of section 633.5. We review for abuse of discretion. (*People v. Nazary* (2010) 191 Cal.App.4th 727, 746.)

Subject to certain exceptions, section 632, subdivision (d) provides that surreptitiously recorded phone calls are inadmissible. Section 633.5 provides that nothing in section 632 "prohibits one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of . . . any felony involving violence against the person, or a violation of Section 653m." Our courts "have examined the relationship between Penal Code sections 632 and 633.5. All have concluded -- correctly -- that the latter exempts from the former an unconsented recording made with the requisite reasonable belief although the recording fails to capture the anticipated evidence [citation] or where the initial purpose of the recording is self-protection rather than to gather evidence for use in criminal prosecution [citation]." (*Lubetsky v. State Bar* (1991) 54 Cal.3d 308, 321.)

Appellant claims that lewd conduct on a child is not a felony involving "violence against the person" within the meaning of section 633.5. Section 667.5, subdivision (c), however, provides that violation of section 288 is a violent felony and a crime of violence against the person. "The statute's unadorned language indicates the Legislature intended to impose increased punishment via section 667.5, subdivision (c) not only for certain felonies which are 'violent' in a physical sense but also for certain felonies which cause extraordinary psychological or emotional harm. [Citation.] By adding subdivision (c) to section 288 in 1981 . . . , the Legislature recognized *both* subdivisions (a) and (b) violations often cause irreparable psychological and emotional

5

damage to child victims."  (*People v. Hetherington* (1984) 154 Cal.App.3d 1132, 1140; see also *People v. Stephenson* (1984) 160 Cal.App.3d 7, 10.)

The trial court reasonably concluded that the phone recording was admissible under section 633.5.  Section 653m, subdivision (b) provides that making repeated phone calls with intent to annoy or harass is a misdemeanor.[2] The purpose of section 653m is to deter people from making harassing phone calls and to secure an individual's right to privacy from unwanted intrusion.  (*People v. Hernandez* (1991) 231 Cal.App.3d 1376, 1384.)

Appellant knew that Karina did not want to talk but continued making calls, supporting the inference that he intended to annoy or harass.  Appellant said as much when he told Katrina that he was probably making her feel uncomfortable.[3]  The calls were made after he was accused of sexually molesting E.  Based on the timing and context of the phone call, the evidence supports the finding that the call was made with the intent to annoy or harass.  We reject the argument that the prosecution had to independently prove intent to harass or annoy.  "[S]uch an interpretation would place the prosecuting authorities at the mercy of the admitted lawbreaker and make the availability of valuable evidence turn on the lawbreaker's articulation of his own state of mind." (*People v. Ayers* (1975) 51 Cal.App.3d 370, 377.)

*Proposition 8 - Truth in Evidence*

---

[2] Section 653m, subdivision (b) provides:  Every person who, with intent to annoy or harass, makes repeated telephone calls . . . to another person is, whether or not conversation ensures for making the telephone call . . . , is guilty of a misdemeanor. "

[3] Karina testified that she and E. stopped talking to appellant and "that's when he started calling and he started leaving voicemail[s]."   During the recorded call, appellant said  "I told you guys [i.e., E. and Karina] that if you guys didn't feel comfortable I would leave you on your own.  If you guys didn't call me back, and since you didn't call me back I, I figured that's what you guys chose.  So, I, you know I, I kinda respected that and I kinda left you guys, you know to work things out on your own. . . . Can you hear me?  Is there something *mija* [*honey: term of endearment*]?  Do you feel uncomfortable that I called you?  Sounded like, I mean, that it made you feel like, . . . that it feels wrong or something?"

6

The phone recording was also admissible under Proposition 8 (Cal. Const. art. 1, § 28, subd. (f)) which excludes relevant, but unlawfully obtained evidence only if the exclusion is required by the United States Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 890, 896; see *People v. Ratekin* (1989) 212 Cal.App.3d 1165, 1169 [section 631 which bars admission of wiretap evidence abrogated by Proposition 8].) Appellant cites no authority that the Cellular Radio Telephone Privacy Act of 1985 (Stats. 1985 ch. 909), which re-enacted section 632, was intended to abrogate Proposition 8. The 1985 Act declares: "[T]his act is intended to provide a legal recourse to those persons whose private cellular radio telephone communications have been maliciously invaded by persons not intended to receive such communications." (West's Cal. Leg. Service (1985) Stats. 1985 Reg.Sess., ch. 909, p. 164.) The narrow scope of the Legislature's intent is confirmed by section 632.5, the primary element of the 1985 Act, which discloses no intent to abrogate Proposition 8.

The legislative history does not show any legislative intent to annul the effects of Proposition 8. "We cannot assume that the Legislature understood or intended that such far-reaching consequences - virtually a legislative repeal of the 'Truth-in-Evidence' section of Proposition 8 - would follow a[ statutory] amendment so casually proposed and adopted without opposition." (*In re Lance W.*, *supra,* 37 Cal.3d at p. 894 [discussion of post-Proposition 8 amendment of section 1538.5.].)

Nor has appellant cited any authority that the United States Constitution requires exclusion of the telephone recording. Because Karina did not record the conversation while acting as a government officer or agent, appellant's rights under the Fourth Amendment are not implicated. (*Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 333.) The Fourth Amendment protects one's oral conversation from the "univited ear," unless one of the parties to the conversation consents to the eavesdropping or recording. (*Katz v. United States* (1967) 389 U.S. 347, 352 [19 L.Ed.2d 576, 582-583]; *People v. Murphy* (1972) 8 Cal.3d 349, 359, fn. 9 ["one party to a telephone conversation may constitutionally allow another to listen to it"]; *People v. Windham* (2006) 145 Cal.App.4th 881, 891-892.)

*Child Sexual Abuse Accommodation Syndrome*

Appellant complains that the expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) was inadmissible and denied him a fair trial. Appellant forfeited the error by not objecting but claims he was denied effective assistance of trial counsel.

At the Evidence Code section 402 hearing, the prosecution argued that E. and G. did not report the sexual misconduct for a year and that CSAAS testimony was admissible to explain why the victims did not seek help sooner. The trial court ordered the prosecution's expert, Dr. Jayme Bernfeld, to testify generally about CSAAS and not render an opinion specific to the case. The jury was given a CALCRIM 1193 limiting instruction.[4]

---

[4] The jury was instructed: "You are about to hear from Dr. Jayme Bernfeld, PhD, regarding something called child abuse accommodation syndrome. Dr. Bernfeld's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not E. O's and G. G.'s conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of their testimony. The testimony of the expert witness on child sexual abuse accommodation syndrome is being offered to you and may be considered by you only for the purpose of understanding and explaining the behavior of one or more of the alleged victims in this case and not as proof the molestation occurred as to any one or more of the victims. [¶] So it's being offered for the sole purpose of helping you to understand and explain the behavior of children as a class generally and to help you understand, if it's determined by you, to apply to the behavior of the alleged victims in this case and not for the purpose of proving that the molestation occurred as to any one or more of the victims in this case."

At the conclusion of the trial, the jury received a CALJIC 10.64 instruction that stated: "Evidence has been presented to you concerning child sexual abuse accommodationsyndrome. This evidence is not received and must not be considered by you as proof that the alleged victim's molestation claim is true. [¶] Child sexual abuse accommodation syndrome research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred, and seeks to describe and explain common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of

8

CSAAS evidence addresses a child's common reactions to sexual abuse and is admissible to disabuse a jury of any myths or misconceptions it might have regarding those reactions. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Housley* (1992) 6 Cal.App.4th 947, 955.) Appellant asserts that the CSAAS evidence was unnecessary because E. and G. were adults at time of trial and capable of relating their experiences.[5] Appellant claims that the CSAAS evidence is irrelevant because the victims consented to a romantic relationship. Consent is irrelevant to the question of whether section 288 was violated or in determining whether CSAAS evidence should be admitted. (*People v. Millhouse* (2003) 109 Cal.App.4th 1612, 1619-1620.) Doctor Bernfeld stated that CSAAS is "a model for helping us understand the context the child sexual abuse occurs and . . . [the] reactions of children who live through that experience." "The model specifically addresses abuse that happened in childhood or adolescen[ce], but also describes the behavior of those children and adolescents as they reach adulthood. So we know that people who were abused as children often don't disclose until adulthood and sometimes not even then,"

It is settled that CSAAS evidence may be admitted "to rehabilitate [a] witness's credibility when the defendant suggests that the child's conduct after the incident - e.g., a delay in reporting - is inconsistent with his or her testimony claiming molestation. [Citations.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300, fn. omitted.) E.'s credibility was challenged early in the trial. In opening statement, appellant's trial attorney told the jury that the People's case was about school girls who had a crush on a popular teacher. "[A]t some point, they got caught up in saying things about [appellant] that just weren't true, especially E. This case is really about E."

proving guilt beyond a reasonable doubt. [¶] You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

[5] At time of trial, E. was 19 years old and attending college G. was 21 and married with one child.

9

Dr. Bernfeld's testimony was properly admitted to explain why sexually abused children delay reporting and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. (*People v. Brown* (2004) 33 Cal.4th 892, 906; *People v. Patino, supra,* 26 Cal.App.4th at pp. 1744-1745.) Dr. Bernfeld stated that one reason for delayed disclosure was that the perpetrator grooms the victim by building a strong bond. By the time the molestation occurs, the victim "feel[s] like an accomplice and a co-conspirator rather than a victim."

Appellant asserts that trial counsel was ineffective because he did not object to the CSAAS evidence on Evidence Code section 352 grounds. The probative value of the evidence was significant and assisted the jury in assessing E.'s and G.'s credibility and reasons for not disclosing the sexual abuse earlier. (See e.g., *People v. Brown, supra,* 33 Cal.4th at p. 906; *People v. Patino, supra,* 26 Cal.App.4th at p. 1744.) Appellant did not suffer ineffective assistance on this issue. (*People v. Weaver* (2001) 26 Cal.4th 876, 931 [counsel has no duty to make frivolous or futile objections]; *People v. Memro* (1995) 11 Cal.4th 786, 834 [same].)

The jury received a CALCRIM 1193 instruction that "[y]ou may consider [the CSAAS] evidence only in deciding whether or not the children's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." The trial court further instructed that Dr. Bernfeld's testimony was not evidence that appellant committed any of the charged crimes. It is presumed that the jury understood and followed the court's instructions. (*Weeks v. Angelone* (2000) 528 U.S. 225, 234 [145 L.Ed.2d 727, 737-738]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83.) There is no merit to the argument that the CSAAS evidence rendered the trial fundamentally unfair or denied appellant due process. (See e.g., *People v. Patino, supra,* 26 Cal.App.4th at p. 1747.)

Appellant argues that other states (Pennsylvania, Kentucky, and Tennessee) exclude CSAAS evidence and that California should do the same. Our state supreme court has approved the admission of CSAAS testimony for the limited purpose of disabusing a jury of misconceptions about how a child victim reacts to or reports sexual

10

molestation. (*People v. McAlpin, supra,* 53 Cal.3d at pp. 1301-1302.) Under principles of stare decisis we are bound to follow decisions of our state supreme court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

*CALCRIM 1193*

Appellant argues that CALCRIM 1993 is flawed because the jury was instructed that it may base its verdict on assumptions inherent in CSAAS research that could support the credibility of the victims. Appellant takes issue with a sentence in CALCRIM 1993 which states that the jury may consider CSAAS evidence "in deciding whether or not E. O.'s and G. G.'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

CALCRIM 1193 did not require the jury to accept the CSAAS evidence or presume that E. or G. were molested. No part of CALCRIM 1193 creates a presumption, conclusive or rebuttable, or shifts the burden of proof. Dr. Bernfeld testified that CSAAS was not a diagnosis or a litmus case and emphasized that he was expressing no opinion on whether the victims were telling the truth. Assuming there is an ambiguity in CALCRIM 1193, the jury received instruction CALJIC 10.64 which stated that CSAAS "research begins with the assumption that a molestation has occurred, and seeks to describe and explain common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent. . . . [¶] You should consider the evidence concerning the syndrome . . . only for the limited of purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

Appellant makes no showing that the jury ignored the court's instructions or that there is a reasonable likelihood that the jury misapplied the instructions. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 [116 L.Ed.2d 385, 398-399]; *People v. Clair* (1992) 2 Cal.4th 629, 663.) We accordingly reject the argument that trial counsel's failure to object to the CSAAS evidence or instructions violated appellant's right to a fair trial or right to effective assistance of counsel.

*Testimony of Appellant's Former Attorney*

11

Under the guise of ineffective assistance of counsel, appellant argues that he was denied a fair trial because the prosecution called appellant's former attorney (Seymour Amster) to rebut Mr. and Mrs. Gomez's testimony that E. was lying.[6] The prosecutor argued that the defense opened up the issue when Mr. and Mrs. Gomez testified that Amster was told about the meetings with E.'s mother. "I think that it goes to their credibility, and that's at issue. [¶] . . . [¶] And as the court knows, in a jury trial, credibility is everything." Appellant argued that the communications involved the attorney-client privilege and attorney work product. The trial court overruled the objections and permitted the prosecution to ask if Amster was aware that the meetings between the Gomezs and E.'s mother were on-going.

Amster stated that he met with appellant's parents after the police commenced a witness tampering investigation. Amster interviewed E.'s mother, Maria, and spoke to E. When asked whether Maria discussed E.'s admission of making false accusations, Amster responded that Maria "never said that to me." When asked whether E. admitted the accusations were false, Amster answered "she did not." Clarifying the time frame, defense counsel asked whether the conversation with E. occurred before Amster interviewed Maria. Amster replied: "Long before, because we had decided we weren't pursuing the initial strategy."

Appellant claims that he was denied effective assistance of counsel because his attorney did not move to strike the "change of strategy" comment on Evidence Code section 352 grounds. Before Amster testified, counsel voiced his concern that objections in front of the jury would imply that "we're hiding something." Trial counsel's decision not to object to or move to strike testimony falls within the wide range of reasonable tactical decisions available to defense counsel. (See *People v. Weaver* (2001) 26 Cal.4th 876, 925; *People v. Lewis* (2001) 25 Cal.4th 610, 674.) After defense counsel cross-

---

[6] Amster represented appellant at the preliminary hearing and at pretrial hearing in which appellant waived jury. Before trial, appellant retained attorney Eric Chase and withdrew the jury waiver.

examined Amster, the jury asked the following clarifying question: "As best [as] you can recollect, what did Maria say to you during your meeting at the end of April 2007?" Amster recounted that Maria was asked if she believed E. was telling the truth. Maria told him that she had no reason to doubt her daughter but did not want appellant to be prosecuted. Amster believed that Maria did not really know whether appellant molested E. but trusted appellant as a teacher and did not want to see him get in trouble.

Appellant claims that trial counsel was ineffective in not objecting to Amster's testimony as hearsay and inadmissible lay opinion testimony. The decision to object is inherently tactical and will seldom establish incompetence. (*People v. Freeman* (1994) 8 Cal.4th 450, 490-491.) Counsel may have believed that an objection would strengthen E.'s and Maria's credibility in the eyes of the jury. Even if we assumed that trial counsel's performance was deficient, appellant makes no showing that he was prejudiced. Prejudice must be established as a demonstrable reality, not simply speculation as to the effect of the errors or omissions of counsel. (*In re Clark* (1993) 5 Cal.4th 750, 766.)

*Attorney Work Product*

Appellant finally argues that Amster's testimony violated his Sixth Amendment right to counsel which includes the work-product doctrine as set forth in *Hickman v. Taylor* (1947) 329 U.S. 495 [91 L.ed. 451].) Appellant concedes that section 1054.6 limits attorney work product in criminal cases to core work product, i.e., writings reflecting an attorney's impressions, conclusions opinions, or legal research or theories. (*People v. Zumudio* (2008) 43 Cal.4th 327, 354-355.)

Appellant argues that the work product limitation undermines his Sixth Amendment right to effective assistance of counsel and compromises counsel's ability to investigate and prepare the defense case thoroughly. A similar argument was rejected by our state supreme court in *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 379-382. Before Amster testified, the court limited the scope of the prosecution's questions to avoid eliciting evidence relating to attorney work product or the attorney client privilege. Amster's testimony was properly admitted to impeach Mr. and Mrs. Gomez and to rebut

13

the defense theory that E. had lied about the sexual molestation. As discussed in *United States v. Nobles* (1975) 422 U.S. 225 [45 L.Ed.2d 141] "one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." (*Id.*, at p. 241 [45 L.Ed.2d at p. 155].)

*Cumulative Error*

Appellant's remaining arguments have been considered and merit no further discussion. The alleged errors were harmless, whether considered individually or collectively. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) Appellant was entitled to a fair trial, not a perfect one. (*Ibid*.) None of the purported errors, either singularly or cumulatively, denied him a fair trial. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1056.)

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

14

Lance A. Ito, Judge

Superior Court County of Los Angeles

_____

Edward Schulman, under appointment by the Court of Appeal, foir Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, Yun K. Lee, Deputy Attorney General, for Plaintiff and Respondent.